697

**EXHIBIT**

tabbies

15

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF LOUISIANA |
| 2 | *********************************************** |
| 3 | UNITED STATES OF AMERICA |
| 4 | v.                              Docket No. 10-CR-213 |
| | New Orleans, Louisiana |
| | Thursday, April 7, 2011 |
| 5 | |
| 6 | MELVIN WILLIAMS and |
| | MATTHEW DEAN MOORE |
| | *********************************************** |

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2      ***********************************************
3      UNITED STATES OF AMERICA

4      v.                              Docket No. 10-CR-213
                                       New Orleans, Louisiana
                                       Thursday, April 7, 2011
5

6      MELVIN WILLIAMS and
       MATTHEW DEAN MOORE
       ***********************************************
7               TRANSCRIPT OF TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE ELDON E. FALLON
8                UNITED STATES DISTRICT JUDGE
                         VOLUME IV
9

10     APPEARANCES:

11     FOR THE GOVERNMENT:           U. S. DEPARTMENT OF JUSTICE
                                     BY:  JARED H. FISHMAN, ESQ
12                                   601 D St., N.W., Room 5544
                                     Washington, DC 20004
13
                                     U. S. DEPARTMENT OF JUSTICE
14                                   BY:  FORREST CHRISTIAN, ESQ.
                                     601 D Street NW, Office PHB 5123
15                                   Washington, DC 20004

16                                   UNITED STATES ATTORNEY'S OFFICE
                                     BY:  JORDAN GINSBERG, ESQ.
17                                   650 Poydras St., Suite 1600
                                     New Orleans, LA 70130
18
       FOR MELVIN WILLIAMS:          FRANK G. DeSALVO, ESQ.
19                                   829 Baronne St.
                                     New Orleans, LA 70113
20
       FOR MATTHEW DEAN MOORE:       ERIC J. HESSLER, ESQ.
21                                   700 Camp St., Suite 104
                                     New Orleans, LA 70130
22
       Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
23                                   500 Poydras Street, Room HB-406
                                     New Orleans, Louisiana 70130
24                                   (504) 589-7776

25         Proceedings recorded by mechanical stenography, transcript
       produced by computer.
```

Case 2:10-cv-04021-CJB-KWR Document 8169 Filed 13/29/16 Page 2 of 23

I N D E X

WITNESS FOR THE DEFENDANTS:                          PAGE/LINE:

DANIEL WHARTON - CONTINUED
   Continued Direct Examination by Mr. Hessler        702/15
   Direct Examination by Mr. DeSalvo                  705/4
   Cross-Examination by Mr. Christian                 706/1
   Redirect Examination by Mr. DeSalvo                722/8
   Recross Examination by Mr. Christian               726/6

MERLINE KIMBLE
   Direct Examination by Mr. DeSalvo                  727/19
   Direct Examination by Mr. Hessler                  731/19
   Cross-Examination by Mr. Fishman                   732/20
   Redirect Examination by Mr. DeSalvo                738/23
   Redirect Examination by Mr. Hessler                740/18

MATTHEW DEAN MOORE
   Direct Examination by Mr. Hessler                  746/7
   Cross-Examination by Mr. Christian                 774/7
   Cross-Examination by Mr. DeSalvo                   805/11
   Redirect Examination by Mr. Hessler                805/25

DR. PAUL McGARRY
   Voir Dire Examination by Mr. DeSalvo               806/21
   Traverse Examination by Mr. Fishman                808/20
   Direct Examination by Mr. DeSalvo                  818/5
   Cross-Examination by Mr. Fishman                   829/12
   Redirect Examination by Mr. DeSalvo                843/15
   Redirect Examination by Mr. Hessler                844/20

JAMIE COHEN SCHNAPP
   Direct Examination by Mr. DeSalvo                  845/20
   Cross-Examination by Mr. Christian                 847/17

MELVIN WILLIAMS
   Direct Examination by Mr. DeSalvo                  848/10
   Cross-Examination by Mr. Fishman                   863/17
   Redirect Examination by Mr. DeSalvo                876/23
   Redirect Examination by Mr. Hessler                877/9

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 3 of 27
Case 2:10-cr-00213-EEF-JCW Document 169 Filed 11/28/11 Page 3 of 163

702

```
 1          (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 2          THE COURT:  Be seated, please.  Good morning, ladies and

 3    gentlemen.  Where is our witness?

 4          MR. HESSLER:  Danny Wharton, sir.

 5          THE COURT:  Take the stand, please, Mr. Wharton.  You're

 6    still under oath, sir.

 7          Any further questions from the defendant?

 8          MR. HESSLER:  Just a few, your Honor.

 9          THE DEPUTY CLERK:  Would you state your name again for

10    the record.

11          THE WITNESS:  Daniel, that's D-A-N-I-E-L, Wharton,

12    W-H-A-R-T-O-N.

13          THE DEPUTY CLERK:  Thank you.

14                           DIRECT EXAMINATION

15    BY MR. HESSLER:

16    Q.  Good morning, Sergeant Wharton.

17    A.  Good morning.

18    Q.  What day did you receive the complaint of this incident?

19    A.  It was July the 31st, which was the next day after the incident

20    occurred.

21    Q.  Do you remember approximately what time on July 31st?

22    A.  I was alerted by my Captain Curole at about seven o'clock P.M.

23    on the 31st.

24    Q.  Prior to that time were you aware of any citizens making any

25    complaints from the 1500 block of Dumaine Street?
```

1  A.  No.

2  Q.  Did you investigate whether or not any complaints had been made

3  during that time span from the 1500 block of Dumaine Street?

4  A.  Yes.  I checked with the communications department to determine

5  if any calls were, had came into the office complaining about

6  officers, and there were no calls from the 30th until the 31st.

7  Q.  And did you find where some police officers had actually been

8  in the 1500 block of Dumaine that day?

9  A.  Yes.  I did locate where there were -- the only calls that we

10 had was when some officers had made a radio transmission to the

11 dispatcher indicating that they were in the 1500 block of Dumaine

12 on July the 30th.

13 Q.  And did you investigate that call?

14 A.  Yes.

15 Q.  And that is -- is that a call that was made by Officer

16 Williams?

17 A.  That was the call made by Officer Williams.

18 Q.  And did that call reflect that he was bringing an intoxicated

19 subject to Charity Hospital?

20 A.  That was his transmission to the dispatcher, yes, sir.

21 Q.  Is that commonly done by the New Orleans Police Department?

22 A.  Yes.

23 Q.  Now, during the course of your investigation, did you attempt

24 to locate witnesses?

25 A.  Yes, I did.

Case 2:10-cr-00213-EEF-JCW  Document 169  Filed 12/29/11  Page 5 of 136

704

1    Q.  And did you locate any?

2    A.  Yes, I located two witnesses.

3    Q.  Okay.  Okay.  Did you interview those witnesses?

4    A.  Yes, sir.

5    Q.  Took statements from them I suppose?

6    A.  Yes, I did.

7    Q.  Did you take statements from the individual officers?

8    A.  I did.  It was a year later due to Hurricane Katrina, it was

9    about a year later that I took a statement from the officers.  But

10   because the incident itself was criminal in nature, they weren't

11   allowed to give me a statement until the incident was classified as

12   administrative.

13   Q.  And after your investigation was completed, did you come to any

14   conclusions?

15   A.  Yes.

16   Q.  And what were those conclusions?

17   A.  The disposition of the case was determined to be unfounded

18   based on the information that I received from the coroner's office

19   and the DA's office.

20   Q.  And what does unfounded mean?

21   A.  Unfounded means that the information regarding the complaint

22   was not factual and the officers did not do what the complainant

23   indicated that they did.

24        MR. HESSLER:  No further questions.  Thank you.

25        THE COURT:  Any questions from the other --

```
 1              MR. CHRISTIAN:  Yes, your Honor.
 2              THE COURT:  No, I don't mean cross.
 3                         DIRECT EXAMINATION
 4   BY MR. DeSALVO:
 5   Q.  At the point when you began your investigation or when you took
 6   their statements, criminal investigation had been closed?
 7   A.  As far as my office was concerned, yes, sir.
 8   Q.  And you made what's called an administrative investigation to
 9   see if any punishment should be meted out within the department?
10   A.  Yes.
11   Q.  You said you had been with the Public Integrity Bureau, PIB or
12   internal affairs for seven years.  How many police officers have
13   you investigated in that period of time?
14   A.  A lot.
15   Q.  And have you had complaints that have been made that you found
16   where the police officers had done what people said they did?
17   A.  Yes.
18   Q.  And were they disciplined?
19   A.  Yes, they were.
20   Q.  Anywhere from what to what?
21   A.  From being fired to arrested to just a simple reprimand.
22              MR. DeSALVO:  Thank you.
23              THE COURT:  You may cross.
24              MR. CHRISTIAN:  Thank you, your Honor.
25                         CROSS-EXAMINATION
```

```
1    BY MR. CHRISTIAN:
2    Q.  Mr. Wharton, you've worked in PIB or Internal Affairs for about
3    seven years?
4    A.  Yes.
5    Q.  You've been with NOPD for how long?
6    A.  Twenty-three years.
7    Q.  In your twenty-three years with the department, you've
8    investigated a lot of cases?
9    A.  Yes, sir.
10   Q.  Talked to civilian witnesses?
11   A.  Yes.
12   Q.  Ever had situations where witnesses have been reluctant to talk
13   to you?
14   A.  Yes, that happens.
15   Q.  Homicide cases?
16   A.  I didn't handle many homicide cases in my career.
17   Q.  What cases have you had where people have been reluctant to
18   talk to you?
19   A.  The bulk of my career was investigating armed robberies and
20   then Internal Affair complaints.
21   Q.  In your Internal Affairs complaints you've had civilians who
22   have been reluctant to talk to you, right?
23   A.  Not most of them.
24   Q.  No?  But some?
25   A.  Most people when they come to our office they're ready to talk.
```

Case 2:10-cv-00215-EEF-JCW   Document 163   Filed 12/30/11   Page 8 of 23

1   Q.   When you say not most, that means some, right?  You have had

2   some witnesses who have been reluctant to talk to you about NOPD

3   involvement, right?

4   A.   Very few.

5   Q.   Okay.  That's still some, correct?

6   A.   One, two, three maybe, yes.

7   Q.   You know who Len Davis is, right?

8   A.   Yes, I remember.

9   Q.   What do you remember about Len Davis?

10  A.   Just that he worked in one district and I worked in another.

11  Q.   You don't remember what Len Davis was convicted for?

12  A.   I didn't follow that case much.

13  Q.   You didn't follow the news?

14  A.   I didn't follow that case much, no, sir.

15  Q.   If I were to show you some newspaper articles from the *Times*

16  *Picayune*, would that refresh your recollection as to what Len Davis

17  was convicted for?

18  A.   Yes.

19  Q.   Okay.

20          MR. CHRISTIAN:  Your Honor, may I approach the witness?

21          MR. DeSALVO:  May we approach the bench, your Honor?

22          THE COURT:  Yes.

23      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

24          MR. DeSALVO:  Unless this officer investigated Len Davis

25  this is just trying to muddy the police department and see how much

1    mud can slide off onto the defendants.

2          MR. FISHMAN:  Not at all, your Honor.

3          MR. CHRISTIAN:  He just said he took two witness

4    statements from people in this case, and that investigation

5    occurred while the Len Davis resentencing and trial was going on;

6    so while that trial was going on he is a NOPD officer going out to

7    the community and saying would you please talk to me about what you

8    saw an NOPD officer do when they beat a man to death, it's the

9    exact same case which is why witnesses were reluctant to talk to

10   him.  The investigation was unfounded because no one would talk to

11   him.

12         MR. FISHMAN:  And every day during the course of that

13   investigation Len Davis was on the front page of the newspaper, it

14   was being run on every news channel, and that was a big part of why

15   the community wouldn't speak to New Orleans Police Department.

16         MR. HESSLER:  You want him to answer that question?

17         MR. DeSALVO:  The witness said he didn't talk to him,

18   one, because of the Black Panthers.

19         MR. CHRISTIAN:  He didn't say that's why they wouldn't

20   talk to him.

21         THE COURT:  The news itself doesn't go into evidence.

22         MR. CHRISTIAN:  Absolutely, just to refresh his

23   recollection.

24         THE COURT:  Let's see where we go with it.  It may be a

25   403, could possibly be 401, okay.  But I don't know about a 403.

1   We'll see about that.

2         MR. CHRISTIAN:  He said, your Honor, it was unfounded

3   because people wouldn't talk to him.

4         THE COURT:  No, I think you ought to be able to make that

5   point, but let's not just nail it in the ground.

6         MR. CHRISTIAN:  Oh, no.  Yes.

7         THE COURT:  Okay.  I understand.

8         MR. HESSLER:  He said it was unfounded because it wasn't

9   factual.

10     (OPEN COURT.)

11        MR. CHRISTIAN:  Your Honor, may I hand the witness these

12  articles?

13        THE COURT:  Yes.

14  BY MR. CHRISTIAN:

15  Q.  Mr. Wharton, those articles from the *Times Picayune*, from the

16  local news channels, they're from the first week of August when you

17  were investigating this case, right?

18  A.  Yes, yes, it is.

19  Q.  So the first week of August, Len Davis, an NOPD officer, was on

20  trial and convicted and ultimately sentenced for hiring a hit man

21  to beat a witness to his -- to kill a witness to his use of

22  excessive force, right?

23  A.  If that's what your report says, yeah.

24  Q.  Take a look at the newspaper articles and tell me if that

25  refreshes your recollection that Len Davis hired a hit man to kill

Case 2:06-cv-04021-CJB-KWR  Document 81-10  Filed 03/20/16  Page 11 of 27
Case 2:10-cr-00213-EEF-JCW  Document 169  Filed 11/28/11  Page 14 of 183

710

```
 1   a witness?

 2   A.  That's what was reported in these things.

 3            MR. DeSALVO:  Your Honor, that's what was reported, it's

 4   not refreshing his recollection, it's hearsay.

 5            THE COURT:  Does that refresh your recollection, sir?

 6            THE WITNESS:  I mean, I remember the case, but I didn't

 7   follow it much.

 8   BY MR. CHRISTIAN:

 9   Q.  As a PIB Internal Affairs officer you didn't follow the trial

10   of a fellow NOPD officer being convicted of hiring a hit man to

11   kill a witness?

12   A.  I was not involved in this trial, sir.

13   Q.  And you didn't follow it as a PIB, Internal Affairs officer?

14   A.  No, this was not a case for PIB at the time.

15   Q.  And you didn't follow it as a 23 year long veteran of NOPD, you

16   didn't follow this case?

17   A.  No.  My career is much higher than that.

18   Q.  When you go out and interview folks in the community, you don't

19   want to know what their concerns might be about coming forward to

20   talk to you?

21   A.  If they stress, if they stress that issue I will talk to them

22   about it, yes.

23   Q.  When no one answered the door you didn't think that that was

24   curious when you knocked on doors on Dumaine Street?

25   A.  I didn't knock on doors on Dumaine Street, sir.
```

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 12 of 27
Case 2:10-cr-00213-EEF-JCW Document 163 Filed 11/28/11 Page 15 of 193
711

```
 1   Q.  How did you go and find people who had seen this incident?
 2   A.  The lone witness that came to my office on the 31st when we
 3   relocated back to the area pointed out two witnesses that were
 4   outside when we got there.
 5   Q.  So you didn't knock on doors?
 6   A.  No, sir, I did not.
 7   Q.  You didn't try to find any witnesses on your own?
 8   A.  No, sir, I did not.
 9   Q.  And then you closed your investigation as unfounded without
10   doing any independent investigation?
11   A.  Three years later, yes.
12   Q.  Okay.  And in that three years in-between there was a criminal
13   investigation, right?
14   A.  It was criminal from the onset.
15   Q.  Okay.  In-between your closing your investigation there was a
16   criminal case, right?
17   A.  Which was being conducted by homicide, that was totally
18   separate and apart from what my office was doing.
19   Q.  Right.  NOPD Sergeant Gerard Dugue led that homicide
20   investigation, right?
21              MR. DeSALVO:  Approach the bench, your Honor?
22              THE COURT:  All right.
23          (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
24              MR. DeSALVO:  He wants to open the door then go through
25   it.  We didn't open the door, he talked about his investigation,
```

1    his investigation.

2           MR. CHRISTIAN:  The investigation, the officer said that

3    there was a criminal investigation in-between his -- he said his

4    was unfounded, which certainly implies the criminal investigation

5    was unfounded.

6           MR. DeSALVO:  He said the district attorney's office --

7    after consulting with the district attorney's office.

8           MR. CHRISTIAN:  The door has been opened.

9           MR. HESSLER:  He actually started a criminal

10   investigation on behalf of PIB and then he terminated it, and my

11   understanding is that he terminated it, the criminal investigation.

12          THE COURT:  You have to approach this in a way that you

13   say that you led a criminal investigation was begun and see where

14   that goes.

15          MR. DeSALVO:  Actually he did not work with homicide on

16   that investigation.

17          MR. HESSLER:  He worked on the criminal side of PIB.

18          MR. CHRISTIAN:  The Duque report has Wharton's name all

19   over it, they had meetings, he turned in stuff to Duque.

20          THE COURT:  Just ask him.

21          MR. CHRISTIAN:  Okay.

22      (OPEN COURT.)

23   BY MR. CHRISTIAN:

24   Q.  Mr. Wharton, you testified that there was a criminal

25   investigation that occurred prior to your administrative

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 14 of 27
Case 2:10-cr-00213-LEF-VCW Document 169 Filed 03/28/11 Page 14 of 136

713

1   investigation, right?

2   A.  Yes, sir.

3   Q.  And that investigation was led by NOPD Detective Gerard Dugue?

4           MR. HESSLER:  Leading, your Honor.

5           MR. CHRISTIAN:  I am just orienting the witness and it's

6   cross-examination.

7           THE COURT:  It's cross-examination, he can lead under

8   cross-examination.

9   BY MR. CHRISTIAN:

10  Q.  Correct, Gerard Dugue led the NOPD investigation?

11  A.  He was a part of the homicide unit that investigated the

12  allegations, yes, sir.

13  Q.  Right.  You met with Gerard Dugue about this case?

14  A.  I never met with Mr., with Dugue about this case per se.  We

15  talked on the phone but our only conversation was, did you forward

16  it to the DA's office, what was their findings, did you get the

17  coroner's report, things like that.  We never really met sit down

18  face to face to talk about this case.

19  Q.  Are you sure about that?

20  A.  As far as I'm concerned, yes.

21          MR. CHRISTIAN:  May I approach, your Honor?

22          THE COURT:  Yes.

23          MR. CHRISTIAN:  I am going to show the witness a police

24  report.

25  BY MR. CHRISTIAN:

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 15 of 27
Case 2:10-cv-00213-LEF-VCW Document 169 Filed 03/28/11 Page 15 of 130

714

```
 1   Q.  Ask if this refreshes your recollection about your contact with
 2   Gerard Dugue in connection with this case?
 3   A.  Which paragraph, sir?
 4   Q.  You can read that whole page, every time your name pops up on
 5   that page.  And actually I welcome you taking the time to read the
 6   report and see how many times your name comes up in the report.
 7   A.  (WITNESS READS DOCUMENT.)  You're looking for a meeting with
 8   myself and Sergeant Dugue?  Because I don't see that.
 9   Q.  Keep reading.  You turned over witness statements, right?
10   A.  (WITNESS READS DOCUMENT.)
11   Q.  You gave Dugue material, right?
12   A.  Yes, but that was sent through the department mail, it was not
13   hand to hand.
14   Q.  Right, but you knew it was going to him, right?
15   A.  Yes.
16   Q.  You knew he was going to conduct a criminal investigation?
17   A.  Yes.
18   Q.  Did you think Dugue was a good choice to lead that criminal
19   investigation?
20   A.  I have no say in who leads an investigation.
21   Q.  I am just asking you, did you think it was a bad choice?  He
22   wasn't a bad choice to lead this investigation, was he?
23              MR. DeSALVO:  Objection as to the relevance.
24              THE COURT:  I sustain that, it's irrelevant, 401, 403.
25   BY MR. CHRISTIAN:
```

Case 2:06-cv-04021-CJB-KWR   Document 81-10   Filed 03/20/16   Page 16 of 27
Case 2:10-cr-00213-LEF-JCW   Document 169   Filed 11/29/11   Page 15 of 193

715

1  Q.  What did you think Dugue was going to do with the material you

2  took from witnesses?

3  A.  When I forwarded it to him -- by him being a supervisor, I

4  didn't know whether he was going to investigate it or delegate it

5  to someone else.  I just forward the information.

6  Q.  You expected that a legitimate criminal investigation would be

7  conducted, right?

8  A.  By the homicide division, yes, sir.

9  Q.  And you knew that Sergeant Dugue was the one who would collect

10  the material and decide what to do with the case, right?

11  A.  Yes, he was the supervisor of homicide at that time.

12  Q.  Would it surprise you then to learn that in his entire career

13  Sergeant Dugue has never sustained a police involved homicide?

14  A.  I don't know the statistics regarding his findings and cases.

15  Q.  Do you know a single police involved homicide he sustained?

16  A.  Again, I don't know the statistics regarding his

17  investigations.

18  Q.  I am just asking you if you know of one, one time that he --

19  A.  I don't know --

20  Q.  -- that he established -- let me finish the question, please.

21  Tell me one time that you know of that Dugue has found an NOPD

22  officer responsible for causing the death of a New Orleans citizen?

23  A.  Like I said, I don't know statistics coming from that office.

24  All I know is what we do in my office, sir.

25  Q.  I am asking if you know a single time, I am not asking for

Case 2:06-cv-04021-GJB-KWR   Document 81-10   Filed 03/20/16   Page 17 of 27
Case 2:10-cr-00213-EEF-JCW   Document 169   Filed 11/28/11   Page 26 of 183

716

```
1    stats.
2    A.  I don't know, I can't tell you that.  That's information that's
3    not privy to me.
4    Q.  Can we pull up the CAD from that morning.  As part of your
5    investigation you looked at the CAD, right, the computer aided
6    dispatch incident recall sheet?
7    A.  I got a copy of that from headquarters, yes.
8    Q.  Is this the document you looked at?
9    A.  Yes, yes, it is.
10   Q.  And part of what you concluded was that in looking at the CAD
11   incident was initiated at 9:14 and the officers had the victim in
12   the back of the car at 9:15 on the way to Charity Hospital, right?
13   A.  Yes, that's correct.
14   Q.  So that's what you concluded.  That was part of your basis of
15   your findings that this was unfound was that nothing could have
16   happened between 9:14 and 9:15, right?
17   A.  That wasn't the only -- this was a document that was included
18   in my disposition, yes.
19   Q.  But that was part of the basis for your finding?
20   A.  That was one piece, yes.
21   Q.  Nothing could happen between 9:14 and 9:15?
22   A.  I didn't say that, but.
23   Q.  Nothing significant, it was just a stop happened at 9:14, they
24   got him in the car at 9:15?
25   A.  Yes.
```

Case 2:06-cv-04021-CJB-KWR   Document 81-10   Filed 03/20/16   Page 18 of 27
Case 2:10-cr-00213-EEF-JCW   Document 169   Filed 11/28/11   Page 21 of 183

717

```
 1   Q.  And they're on their way to Charity?

 2   A.  Yes.

 3   Q.  You know that this record comes from an officer just

 4   communicating on the radio, right?

 5   A.  I do know that.

 6   Q.  So it's not actually when something happened, it's just when

 7   the officer actually gets on the radio?

 8   A.  Right, because something could have happened before.

 9   Q.  Right.  You wouldn't expect somebody to be to making an arrest,

10   handcuffing a subject, and also simultaneously on the radio saying

11   we're initiating an incident right now?

12   A.  We've had officers over my career have had the ability to do

13   that, yes.  To be in a scuffle and transmitting on the radio at the

14   same time, that has happened before.

15   Q.  Did the defendant tell you that happened in this case?

16   A.  No, that didn't happen in this case.

17   Q.  Can you we bring up the trip sheet.  Did you look at the trip

18   sheet?

19   A.  Yes, I did.

20   Q.  According to the trip sheet officers were there at nine

21   o'clock, right, on Dumaine and North Robertson?

22   A.  Exactly, that's what the trip sheet says.

23   Q.  So if part of your conclusion was that the witnesses -- this

24   incident was unfounded because the incident couldn't happen between

25   9:14 and 9:15, this, in fact, shows they were there at nine
```

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 19 of 27
Case 2:10-cr-00213-EEF-JCW Document 169 Filed 11/28/11 Page 22 of 103

718

1   o'clock?

2   A.   A lot of times with my experience looking at officer trip

3   sheets when we're investigating cases, they don't always put the

4   times to the minute.  They're usually working on recollected times,

5   it's not always to the minute, the exact minute when they arrive on

6   the season of an incident.

7           And again, a lot of times we don't rely on the trip

8   sheet, we rely on dispatch communications.

9   Q.   Did you actually listen to the dispatch from that day?

10  A.   Yes, sir.  Yes.

11  Q.   Can we play that clip from 9:14.

12      (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

13  BY MR. CHRISTIAN:

14  Q.   That's when the call was initiated at 9:14, right?

15  A.   9:14, that's correct.

16  Q.   You heard the moaning in the background at 9:14?

17  A.   Yes.  I put that in my report, yes.

18  Q.   Other than what the CAD shows about the officer actually

19  getting on the radio at 9:14, is there any other reason that you

20  know of that this happened at 9:14?

21  A.   Other than what the CAD shows, no, I don't.

22  Q.   You just relied on what the officer said happened in terms of

23  his radio communications to decide that this incident happened at

24  9:14?

25  A.   Yes.

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 20 of 27
Case 2:10-cr-00213-EEF-JCW Document 169 Filed 11/28/11 Page 29 of 163
719

```
 1   Q.  You also took a statement from the defendant, right, Defendant

 2   Matthew Dean Moore?

 3   A.  Yes, I did, sir.

 4   Q.  Do you remember that statement?

 5   A.  It was three years -- a couple of years ago, I don't remember

 6   it verbatim.

 7   Q.  This was after the criminal case, right?

 8   A.  Right.

 9   Q.  I assume you looked at the statement Matthew Dean Moore gave

10   during the criminal case?

11   A.  To --

12   Q.  To Dugue?

13   A.  No, I never looked at his statement.

14          MR. DeSALVO:  Your Honor, I would ask that the government

15   use the word criminal investigation rather than criminal case,

16   there was no criminal case.

17          THE COURT:  I agree with that.

18          MR. CHRISTIAN:  It was definitely just an investigation.

19   BY MR. CHRISTIAN:

20   Q.  Do you remember Officer Moore stating that he remembered the

21   incident and recalled an unknown male coming towards them, he and

22   Officer Williams, at a rapid pace followed by "a couple of people

23   behind him."  Officer Moore said it appeared to him that a "drug

24   riff" may have taken place.

25          The next part of the sentence is unreadable.  The next
```

Case 2:06-cv-04021-CJB-KWR Document 81-10 Filed 03/20/16 Page 21 of 27
Case 2:10-cr-00213-LEF-VCW Document 169 Filed 11/20/15 Page 24 of 103

720

1    page it says:  Decided to investigate and attempted to call the

2    male over, but the male was not only trying to get away from the

3    people following him, he was also trying to get away from Officer

4    Moore by making some type of move a couple of times?  Do you

5    remember?

6    A.  Yes, that was a statement I took from Officer Moore.

7              THE COURT:  And you recall him telling you that, sir?

8              THE WITNESS:  Yes, sir, I do.

9    BY MR. CHRISTIAN:

10   Q.  Did you read the police report that Moore and Williams turned

11   in for this incident?

12   A.  During my investigation, I did, yes.

13   Q.  Can we pull up the narrative of that.  Can you blow it up a

14   little bit.  You read this narrative, correct?

15   A.  Yes, sir.

16   Q.  I will give you a chance to read it now, and tell me where you

17   find the part about this man being chased by a group of people and

18   a drug riff and trying to get away from them.

19   A.  That is not in the report.

20   Q.  You don't see it in there, do you?

21   A.  No, sir.

22   Q.  That trouble you at all that these were two inconsistent

23   statements about what happened that day?

24   A.  I didn't consider it inconsistent.

25   Q.  One person is being chased by a group of people, another person

Case 2:06-cv-04021-CJB-KWR    Document 81-10    Filed 03/20/16    Page 22 of 27
Case 2:10-cr-00213-EEF-JCW    Document 169    Filed 11/28/11    Page 25 of 183

721

```
 1   is just being pointed to by a group of people?
 2   A.  I didn't consider the statement to be inconsistent.
 3   Q.  Did you read the statement that is in the Dugue report, did you
 4   read the criminal investigation report by Dugue?
 5   A.  I was never privy to Detective Dugue's information because it
 6   was a homicide investigation.
 7   Q.  Never read any of that important report?
 8   A.  No, sir.
 9           MR. CHRISTIAN:  Okay.  Thank you very much.
10           THE COURT:  And redirect?
11           MR. CHRISTIAN:  One moment, your Honor.  Sorry about
12   that.  One last question.
13           THE COURT:  All right.
14   BY MR. CHRISTIAN:
15   Q.  You said you relied in part of the coroner's office finding?
16   A.  Yes.
17   Q.  That this was not -- this was an accidental death?
18   A.  When I got the report the death was accidental, yes.
19   Q.  And that was an important part of your conclusion?
20   A.  Yes, it was.
21   Q.  This was an unfounded allegation of a police involved homicide?
22   A.  That was part of my conclusion, yes.
23   Q.  The CAD was an important part of your conclusion, the incident
24   recall sheet about the timing?
25   A.  And the statement taken from the lone witness that did come
```

1    forward.

2    Q.   And then the statement from the defendants?

3    A.   From the -- not much their statements but the statements of the

4    lone witness, the two other witnesses, the coroner's report and the

5    DA's office reluctance to prosecute.

6          MR. CHRISTIAN:   Okay.   Thank you very much.

7                        REDIRECT EXAMINATION

8    BY MR. DeSALVO:

9    Q.   Sergeant Wharton, Flank DeSalvo.   How are you?

10         The government has asked you what were important parts of

11   your conclusion.   Who originally came to the public integrity

12   bureau and made the complaint?

13   A.   There was one lone female that came from the, she stated she

14   lived in the block and was watching --

15         MR. CHRISTIAN:   Objection, your Honor.

16         THE COURT:   She lived in the block, that's all.   And the

17   reason for that, members of the jury, if the witness is going to

18   come, let the witness say that, not what somebody told him.

19         MR. DeSALVO:   Approach the bench, your Honor, because I

20   don't think the court understands where we're going.

21         THE COURT:   Sure.

22     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

23         THE COURT:   You can establish that she said something but

24   what she said is really hard to tell.

25         MR. DeSALVO:   This is the reason, the biggest reason that

Case 2:06-cv-04021-CJB-KWR   Document 81-10   Filed 03/20/16   Page 24 of 27
Case 2:10-cr-00213-EEF-JCW   Document 169   Filed 11/28/11   Page 27 of 163
723

 1   they found it was unfounded was this is the woman who came in and

 2   testified that Ponytail was there.  They've opened the door, I can

 3   drive a Mack truck through it now.

 4         MR. CHRISTIAN:  They already started off his direct by

 5   saying that they said considering it unfounded after speaking to

 6   two civilian witnesses, so I think that's as far as they can go on

 7   this front.  Why that witness was reliable, he can't say.

 8         MR. DeSALVO:  You're questioning their decision process

 9   as to why they did what they did and they're saying their decision

10   process was faulty when they have a witness who comes in and says

11   somebody was there who was not only not there but was in Hawaii.

12         MR. CHRISTIAN:  In argument I might say it's faulty, as

13   far as on the cross-examination I asked him what the basis for his

14   opinion was.

15         MR. DeSALVO:  This is the basis for his opinion.

16         MR. CHRISTIAN:  You've already gotten that in.

17         MR. DeSALVO:  No, no, no.  The basis for and why it was

18   unfounded.

19         THE COURT:  Let's do it this way.  He said it was

20   unfounded, I think you have a right to say why did you concluded it

21   was unfounded.  And I don't know about somebody's telling you this

22   and telling you that, but why did you conclude that, I think that's

23   legitimate.

24         MR. CHRISTIAN:  Your Honor, one quick thing.  I assume if

25   they get to get in what part was unfounded, what made them conclude

Case 2:06-cv-04021-CJB-KWR  Document 81-10  Filed 03/20/16  Page 25 of 27
Case 2:10-cr-00213-EEF-JCW  Document 169  Filed 11/28/11  Page 28 of 183
724

```
 1   this witness was not telling the truth that I will get to ask

 2   whether it was consistent with the beating described otherwise with

 3   the injuries that were described?

 4             MR. DeSALVO:  That's the coroner's, pathologist's duty.

 5             THE COURT:  Well, not only that but you had cross, you

 6   did the cross, he has him under redirect.

 7             MR. FISHMAN:  The person who they're trying to get called

 8   Ponytail was then shown a six pack ID.  She did not identify the

 9   person who is known as Ponytail.  She misidentified that person.

10   So anything that has to do with them claiming that she actually

11   identified Ponytail, she used a nickname, she picked the six pack,

12   she did not pick the person who was in Hawaii, so all of this is

13   irrelevant.

14             MR. CHRISTIAN:  It's just a side show.

15             MR. FISHMAN:  It's a side show.

16             MR. DeSALVO:  Okay.

17             THE COURT:  I understand.

18             MR. DeSALVO:  Of course she couldn't identify Ponytail

19   because none of them saw what happened that day, we'll argue it.

20             MR. CHRISTIAN:  You're ready for argument?

21             MR. DeSALVO:  Yeah, we are.

22        (OPEN COURT.)

23   BY MR. DeSALVO:

24   Q.  You testified that you came to the conclusion that the

25   complaint was unfounded?
```

Case 2:06-cv-04021-CJB-KWR  Document 81-10  Filed 03/20/16  Page 26 of 27
Case 2:10-cr-00213-EEF-JCW  Document 169  Filed 11/28/11  Page 25 of 103

725

1  A.  Yes, sir.

2  Q.  And the government has asked you several reasons why you found

3  it unfounded, talked about the CAD report and the trip sheet.  Was

4  that the only reason why you found it unfounded?

5  A.  No, sir, that was not.

6  Q.  Tell the ladies and gentlemen of the jury what else it was that

7  made you find it unfounded?

8  A.  There was -- the lone witness that did come to my office to

9  make the complaint indicated that there was a female officer that

10  arrived on the scene.  She named her by the moniker of Ponytail.

11  My investigation revealed the Ponytail was an officer by the name

12  of Jamie Cohen, found out that Officer Cohen was on vacation in

13  Hawaii at the time this individual put her on the scene, and she

14  could not have been there.

15  Q.  So you found that witness's testimony uncredible?

16  A.  That's correct.

17  Q.  Unbelievable?

18          MR. CHRISTIAN:  Objection, your Honor.

19          THE WITNESS:  I didn't believe that --

20          THE COURT:  Overrule the objection.

21          THE WITNESS:  -- after discovering that Officer Cohen was

22  in Hawaii, everything that that witness told me could not have been

23  correct at that point.

24          MR. DeSALVO:  Thank you, Sergeant Wharton.

25          THE COURT:  Any questions?

Case 2:06-cv-04021-GJB-KWR   Document 81-10   Filed 03/20/16   Page 27 of 27
Case 2:10-cr-00213-EEF-JCW   Document 169   Filed 11/28/11   Page 30 of 163

726

```
 1                 MR. HESSLER:  No, sir, your Honor.

 2                 MR. CHRISTIAN:  Opportunity for brief recross?

 3                 THE COURT:  On that area I'll allow it, and I do so under

 4     611(c).  Just on that area.

 5                            RECROSS EXAMINATION

 6     BY MR. CHRISTIAN:

 7     Q.  Mr. Wharton, you showed this woman a six pack lineup, right?

 8     A.  I showed her three lineups, yes.

 9     Q.  And she wasn't able to identify Ponytail as the officer on the

10     scene, was she?

11     A.  She misidentified that officer, yes, she did.

12     Q.  She wasn't able to identify her, right?

13     A.  She was not.

14     Q.  You didn't talk to Gus Lewis, did you?

15     A.  Who is Gus Lewis, sir?

16     Q.  Exactly.  You didn't talk to Guy Humble, did you?

17     A.  None of those people came forward.

18     Q.  You didn't talk to Terry Young, right?

19     A.  All of those people were out there and no one came forward but

20     one person.

21     Q.  And this was during the Len Davis investigation and sentencing,

22     right?

23                 MR. DeSALVO:  Objection, your Honor.

24                 THE COURT:  Asked and answered, I sustain the objection.

25                 MR. CHRISTIAN:  Thank you.
```